2006 WY 9

**KENNEDY OIL, a Wyoming Corporation, Appellant (Plaintiff),**

and

**The Restated Jean P. Harriet Marital Trust and its trustees Honara A. Harriet, Susan I. Harriet, Alex S. Harriet, Christopher J. Harriet, Casey J. Harriet, Martin S. Harriet; the Lohse Security Trust and its Trustee Laci Harriet; the Mike Harriet Trust and its Trustee Mike Harriet; Charles B. Marton; Patricia Marton; John P. Marton; Bernadette Marton Arno; John W. Arno; Celeste C. Arno–Besel; the Arno Mineral Trust and Bernadette C. Arno, John W. Arno and Celeste C. Arno–Besel as its Trustees; S9 Minerals Limited Partnership; John P. Marton Minerals LLC; Charles B. Marton Minerals LLC; Catherine No. 1, LLC, a Wyoming Limited Liability Company and each of its members including S9 Minerals Limited Partnership, the Restated Jean P. Harriet Marital Trust, the Restated Martin S. Harriet Revocable Trust, the Lohse Security Trust, the Mike Harriet Trust, John P. Marton Minerals, LLC, Appellants (Third Party Defendants),**

v.

**LANCE OIL & GAS COMPANY, INC., a Delaware Corporation, and Williams Production RMT Company, Inc., a Delaware Corporation, Appellees (Defendants/Third Party Plaintiffs).**

No. 05–95.

Supreme Court of Wyoming.

Jan. 17, 2006.

Representing Appellants: Morris R. Massey of Brown, Drew & Massey, LLP, Casper, Wyoming; and Timothy J. Kirven of Kirven & Kirven, P.C., Buffalo, Wyoming.

Representing Appellees: Patrick R. Day, P.C., and James R. Belcher, P.C., of Holland & Hart, LLP, Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] In a quiet title dispute involving mineral interest lessees, the district court relied upon the relation-back doctrine in granting summary judgment to the appellees. We affirm, but on the related doctrine of after-acquired title or estoppel by deed.

## FACTS

[¶ 2] In pursuing their respective summary judgment motions in the district court, the parties entered into a Joint Stipulation of Facts, from which we have gleaned the following information:

[¶ 3] As of 1975, members of the Harriet and Marton families (collectively Harriet–Marton) owned the oil, gas, and other minerals, except coal, lying in and under the N1/2 of Section 19, Township 48 North, Range 78 West, 6th P.M., in Johnson County, Wyoming (the subject property). On December 11, 1975, Harriet–Marton executed a lease in favor of William D. Gibbs, Sophia D. Gibbs,

Robert M. Gibbs, and Martha W. Gibbs (collectively Gibbs), in which Harriet–Marton averred that they owned and could provide marketable title to all of the oil and gas in and under the subject property.[1] In exchange for rights under the lease, Gibbs obligated themselves to commence drilling an exploratory well into the Shannon Formation. Upon completion of the well, Gibbs was to receive the oil and gas as lessee for three years and as long thereafter as oil and gas was produced in paying quantities. In addition, the lease agreement spelled out the parties' rights and obligations regarding expenses and production, and the effects of non-production. Although the lease agreement was not recorded, a memorandum referring to it was recorded on March 30, 1976. Pursuant to this lease agreement, the Catherine No. 1 and Catherine No. 2 wells were completed as productive on April 1, 1976, and May 12, 1977, respectively.

[¶ 4] Upon William D. Gibbs' death, his estate was probated in Johnson County. On September 23, 1991, Harriet–Marton filed creditors' claims in the probate proceedings based upon the 1975 lease agreement, seeking an accounting of income received and expenses paid, and payment of any sums due in regard to the Catherine No. 1 well. Those creditors' claims were settled on June 7, 1994, in an Agreement Concerning Creditor's Claims entered into between the personal representatives of the estate and the then-current Harriet–Marton entities. The gist of that agreement was that Harriet–Marton were not entitled to a share of the production proceeds because expenses ($552,397.17) exceeded production ($283,803.42), but that Harriet–Marton might in the future be entitled to distributions in the event Gibbs' successors recovered costs and production continued. To ensure such distributions, the personal representatives obligated the estate's distributees to provide Harriet–Marton an annual accounting concerning the well.

The settlement terms were made part of the estate's distribution plan.

[¶ 5] On May 21, 1998, the appellees (Lance–Williams) obtained, through their agent, Baseline Minerals, Inc., oil and gas leases from Harriet–Marton covering the subject property. The lessors were the same as, or the successors in interest to, the Harriet–Marton mineral owners that were parties to the 1975 lease agreement with Gibbs. In each of the four separate 1998 leases, Harriet–Marton struck the following form language: "Lessor hereby warrants and agrees to defend the title to said land." The primary term of the leases was five years, subject to extension for an additional two years. A concurrent title opinion prepared for Baseline indicated that there were no current unreleased oil and gas leases of record covering the property.

[¶ 6] On October 17, 2002, Harriet–Marton recorded with the Johnson County Clerk a "Notice of Claim of Interest in Real Property." The notice, signed under oath by John P. Marton, declared that Harriet–Marton claimed an interest in the subject property based upon the 1975 lease agreement and the Gibbs distributees' failure to abide by the terms and conditions of the probate settlement agreement. The notice indicated that it was given pursuant to Wyo. Stat. Ann. §§ 34–10–107 and 34–11–101 (LexisNexis 2005).[2] A few months later, Harriet–Marton filed a civil action against the Gibbs distributees, with the verified complaint containing the following factual allegations and legal conclusions:

1. The plaintiffs are the successors in interest to the Harriet–Marton interests under the 1975 lease.

2. Upon Gibbs' drilling of the Catherine No. 1 well, the oil and gas in and under the subject property was leased to Gibbs for three years and as long thereafter as such was produced in paying quantities.

---

1. The parties entered into a similar agreement in June of the same year, but the December agreement has been treated throughout these and related proceedings as the operative agreement.

2. Wyo. Stat. Ann. § 34–10–107 is part of the marketable record title act, the purpose of which

legislation is to allow "persons to rely on a record chain of title." Wyo. Stat. Ann. § 34–10–102 (LexisNexis 2005). In turn, Wyo. Stat. Ann. § 34–11–101 provides for the recording of affidavits "stating facts relating to matters which may affect the title to real estate[.]"

3. If production ceased, Gibbs' interest would not terminate if Gibbs commenced additional drilling or reworking operations within sixty days. Furthermore, if there was no production at the end of the primary term of the lease, the agreement would remain in effect only so long as Gibbs continued drilling or reworking operations with no cessation thereof for more than thirty days.

4. Gibbs was required under the lease agreement to keep and make available to Harriet–Marton an accurate record of costs, expenses, charges, and credits.

5. The 1975 lease agreement has "terminated by reason of the fact that the primary term of the lease of three (3) years has expired and that neither oil nor gas is being produced in paying quantities from the N1/2 of said Section 19."

6. The 1975 lease agreement "has terminated according to its terms and [the Gibbs distributees] have no further interest therein."

7. The 1975 lease agreement has terminated because, "[a]fter initial discovery of oil in the Catherine No. 1[w]ell, the production thereof has ceased and [the Gibbs distributees] have not commenced additional drilling or reworking operations within sixty (60) days after the cessation of production."

8. The 1975 lease agreement has terminated because the Gibbs distributees have failed to maintain the records and to provide to Harriet–Marton the information required in the probate settlement agreement.

[¶ 7] Finally, as the concluding paragraph in three separate causes of action, the Verified Complaint stated as follows:

[Harriet–Marton] are entitled to a declaration of the respective legal rights of [Harriet–Marton] and [the Gibbs distributees] and [to] a determination that the 1975 Agreement between [Harriet–Marton and the Gibbs distributees] is terminated ... and [the Gibbs distributees] have no further right, claim or title under the terms of said 1975 Agreement; nor to the oil, gas or other minerals lying in or under the [subject property].

[¶ 8] During the pendency of their lawsuit against the Gibbs distributees, Harriet–Marton formed a limited liability company called Catherine No. 1, LLC. The members of Catherine No. 1, LLC are either the original mineral owners or the successors in interest to the original mineral owners who signed the 1975 lease agreement, and are either the original lessors or the successors in interest to the original lessors who signed the 1998 Baseline leases.

[¶ 9] Harriet–Marton's civil action against the Gibbs distributees was dismissed with prejudice, prior to any adjudication, on August 8, 2003. Dismissal followed the parties' filing of their Stipulation for Dismissal With Prejudice on July 31, 2003, which stipulation recited only that. "the parties herein have agreed to a settlement of all claims of the parties[.]" It is undisputed that, as part of the settlement, the Gibbs distributees assigned their interests in the 1975 lease agreement to Catherine No. 1, LLC, leaving Catherine No. 1, LLC with a 96% interest in rights granted by the 1975 lease agreement.

[¶ 10] The current controversy has its genesis in what happened next. On December 8, 2003, Harriet–Marton and Catherine No. 1, LLC assigned to the appellant (Kennedy) all of their right, title, and interest in and to the 1975 lease agreement, covering the subject property from the surface to the base of the Fort Union Formation. That assignment was one of the terms of a broader agreement entered into on that same date by Harriet–Marton, Catherine No. 1, LLC, and Kennedy, whereby Kennedy leased the oil and gas on the subject property. Significantly, Kennedy undertook as part of the agreement to pursue for itself and the lessors, a quiet title action against "conflicting claimants." Those "conflicting claimants" were, of course, Lance–Williams, who were Harriet–Marton's lessees under the 1998 lease agreements.

[¶ 11] True to its word, on February 3, 2004, Kennedy filed the quiet title action that underlies this appeal, naming Lance–Williams as the only defendants. The focal allegation of Kennedy's complaint is that,

[t]hrough oil and gas leases dated May 21, 1998, as extended, *executed while the subject oil and gas leasehold estate under the December 11, 1975 oil and gas lease remained in force and effect by virtue of production from or allocated to the leased lands,* [Lance–Williams] claim an estate or interest in the oil and gas leasehold estate which is adverse to the claim of Kennedy.[3]

(Emphasis added.) Harriet–Marton are now also parties to the action, as a result of Lance–Williams' third party complaint.

[¶ 12] After hearing cross motions for summary judgment, the district court ruled in favor of Lance–Williams. The district court found that: (1) Harriet–Marton manifested an unequivocal intention to enter into the 1998 Baseline leases; (2) Harriet–Marton accepted both the initial bonus payments and the extension payments under those leases; (3) at the time of the 1998 leases, Baseline had no actual knowledge of the 1975 lease agreement; (4) at the time of the 2003 leases, Kennedy had actual knowledge of the 1998 Baseline leases; (5) Harriet–Marton's attempt to re-lease minerals to Kennedy that were already leased to Lance–Williams offends notions of justice and equity; and (6) equity demands application of the doctrine of relation as set forth in *Walliker v. Escott,* 608 P.2d 1272, 1278 (Wyo.1980).

## ISSUES

[¶ 13] In their appellate briefs, the parties have identified ten interrelated issues and arguments for appellate review, with the primary issue being the district court's application of the relation-back doctrine. We find the dispositive issue to be whether Harriet–Marton and Kennedy are estopped from denying Lance–Williams' title. In answering that question, we will contrast the doctrines of relation and estoppel by deed, and we will briefly discuss the recording act. Given our resolution of those issues, it will be unnecessary to address the other issues raised by the parties.

## STANDARD OF REVIEW

[¶ 14] We have often restated our standard for the review of a summary judgment and we will not repeat it at length here. *See Linton v. E.C. Cates Agency, Inc.,* 2005 WY 63, ¶¶ 6–7, 113 P.3d 26, 28 (Wyo.2005); *Lewis v. Community First Nat. Bank, N.A.,* 2004 WY 152, ¶ 8, 101 P.3d 457, 459 (Wyo. 2004); and *Bidache, Inc. v. Martin,* 899 P.2d 872, 873–74 (Wyo.1995). We will note, in particular, that we will uphold a summary judgment on the basis of any proper legal theory appearing in the record. *Lewis,* 2004 WY 152, ¶ 8, 101 P.3d at 459; *Bitker v. First Nat. Bank in Evanston,* 2004 WY 114, ¶ 8, 98 P.3d 853, 855 (Wyo.2004); and *Hutchins v. Payless Auto Sales, Inc.,* 2004 WY 22, ¶ 12, 85 P.3d 1010, 1013 (Wyo.2004). Although decisions made in equity after a bench trial are reviewed for an abuse of discretion, the same is not true where summary judgment has been entered; in such cases, our review is *de novo. Birt v. Wells Fargo Home Mortg., Inc.,* 2003 WY 102, ¶ 30, 75 P.3d 640, 652 (Wyo.2003); *McNeill Family Trust v. Centura Bank,* 2003 WY 2, ¶¶ 9–10, 60 P.3d 1277, 1282 (Wyo.2003); and *Thompson v. Board of County Com'rs of the County of Sublette,* 2001 WY 108, ¶¶ 6–7, 34 P.3d 278, 280–81 (Wyo.2001).

## DISCUSSION

### *The Relation–Back Doctrine*

[¶ 15] The district court granted summary judgment to Lance–Williams on the basis of the doctrine of relation set forth in *Walliker.* Also sometimes referred to as "relation-back," the doctrine as used in *Walliker* has its origins in the multi-step process necessary to perfect title to lands homesteaded under the various public land laws. We have described the doctrine in that context as follows:

**3.** No doubt, the "or allocated to" language appears because, on June 1, 1983, a portion of the subject property was committed to the Indian Creek (Shannon C Sand) Unit as Unit Tract 15, the Indian Creek Unit having been created for secondary recovery operations in the Shannon Formation. Pursuant to the Unit Agreement, a specified percentage of unit production was allocated to the working interest owners in Unit Tract 15.

The legal title thereafter conveyed to him by the patent was based upon that equitable one, and without which no patent could rightfully issue. In *United States v. Detroit Lumber Co.*, 200 U.S. 321–334, 26 Sup.Ct. [S.Ct.] 282, 286 (50 L.Ed. 499) the court said:

"A patent from the United States operates to transfer the title, not merely from the date of the patent, but from the inception of the equitable right upon which it is based. *Shipley [Shepley] v. Cowan*, 91 U.S. 330 [23 L.Ed. 424]. Indeed, this is generally true in case of the merging of an equitable right into a legal title."

This doctrine of relation is a fiction of law resorted to whenever justice requires. In *Landes v. Brant*, 10 How. 348, 13 L.Ed. 449, it is said:

"To protect purchasers, the rule applies 'that where there are divers acts concurrent to make a conveyance estate, or other thing, the original act shall be preferred, and to this the other acts shall have relation,' as stated in Viner's Abr. tit. Relation, 290. * * * Cruise on Real Property, vol. 5, pp. 510, 511, lays down the doctrine with great distinctness. He says: 'There is no rule better founded in law, reason, and convenience than this, that all the several parts and ceremonies necessary to complete a conveyance shall be taken together as one act, and operate from the substantial part by relation.'"

This doctrine was applied by the Supreme Court of Michigan in *Clark v. Hall*, 19 Mich. 356–372, in which case Chief Justice Cooley said:

"A further objection arises upon the conveyance made of the land by Conant. It appears that he conveyed to one Russell before he received a patent. The conveyance was by quitclaim, and defendant claims that as Conant had no legal title at the time, his deed conveyed none, and the title he subsequently acquired by the patent did not inure to the benefit of Russell, inasmuch as there were no covenants in his deed to transfer the title by way of estoppel. The general

principle unquestionably is that a government patent, when issued, relates back to the original entry, and perfects and makes valid any attempted transfer by the patentee intermediate the entry and patent."

*Roberts v. Hudson*, 25 Wyo. 505, 173 P. 786, 787–88 (1918). More succinctly, we stated in *Tendolle v. Eureka Oil Syndicate*, 38 Wyo. 442, 268 P. 185, 187 (1928):

The principle of such authorities does not interfere with the operation of the doctrine of relation so often applied in cases where the entryman of public lands gives a deed thereto before obtaining a patent from the government. This doctrine of relation is fully explained in *Roberts v. Hudson*, 25 Wyo. 505, 173 P. 786, and cases there cited. When it becomes necessary in furtherance of justice, a transfer of title that is the result of several steps or transactions is held to take effect by relation from the first substantive act. Note, 15 Am. Dec. 253. The patent, which is the consummation of title, in equity relates back to the entry which is the inception of title.

*See also Robinson Mercantile Co. v. Davis*, 26 Wyo. 484, 187 P. 931, 932 (1920) and *Demars v. Hickey*, 13 Wyo. 371, 80 P. 521, 521–522, reh. denied 13 Wyo. 371, 81 P. 705 (1905) (disapproved of on other grounds in *Texas West Oil and Gas Corp. v. First Interstate Bank of Casper*, 743 P.2d 857, 859 (Wyo.1987)).

[¶ 16] Similar to the problem of establishing title to land from entry to patent is the problem of establishing a water right from permit application to actual appropriation. The doctrine of relation, consequently, has been adapted to and applied to the latter situation:

The doctrine of relation back has been long recognized in Wyoming jurisprudence in both case law and statute. *See Campbell v. Wyoming Development Co.*, 55 Wyo. 347, 100 P.2d 124 (1940); *Van Tassel Real Estate & Live Stock Co. v. City of Cheyenne*, 49 Wyo. 333, 54 P.2d 906 (1936); *Moyer v. Preston*, 6 Wyo. 308, 44 P. 845 (1896); Wyo. Stat. Ann. §§ 41–4–506, 41–3–401(a), 41–4–512 (LexisNexis 2001). The doctrine invokes the "principle by which,

when an act is done at one time, it is considered, by a fiction of law, as if done at some antecedent time." 2 Clesson S. Kinney, A Treatise on the Law of Irrigation and Water Rights § 743 at 1284–85 (2d ed.1912). The courts adopted the doctrine solely for the purpose of justice founded in law, reason, and convenience based on broad equitable principles. *Id.* at 1285. Water law borrowed this property doctrine to protect the appropriator against intervening filings that could subordinate his expected priority between the filing of the permit for an appropriation and the actual physical appropriation. A. Dan Tarlock, Law of Water Rights and Resources § 5:62 at 5–104 (2001). Hence, "[p]riority is determined from the date of the manifestation of intent, not the date of actual application of the water to beneficial use." *Id.*

Relation back has always been a flexible doctrine generally used to protect the parties' expectations when an unexpected event occurs. *Id.* at 5–105. * * *

* * * In *Campbell,* we referred to the doctrine of relation back as the "right of gradual development[.]"

*In re General Adjudication of All Rights to Use Water in Big Horn River System,* 2002 WY 89, ¶¶ 20–22, 48 P.3d 1040, 1048–49 (Wyo.2002) (footnote omitted). Clearly, as in the context of an entry upon public land and a later patent, the relation-back doctrine was applied to water rights because of the sequential process involved from permit application to actual appropriation. No doubt, the same reasoning fostered the legislature's adoption of Wyo. Stat. Ann. § 29–1–305(b) (LexisNexis 2005), which provides, in substance, that the priority of a perfected materialman's lien relates back and attaches to the improvements made from the commencement of a construction project over liens later perfected. *See Thatcher & Sons, Inc. v. Norwest Bank Casper, N.A.,* 750 P.2d 1324, 1327 (Wyo.1988).

[¶ 17] Finally, before we discuss *Walliker* and its application to this case, we will note application of the relation-back doctrine in our own rules of civil procedure. In W.R.C.P. 15(c), this Court specifically applied the doctrine to amended court pleadings. *See Bell v. Schell,* 2004 WY 153, ¶¶ 19–22, 101 P.3d 465, 470–71 (Wyo.2004). Further, although not stated by name, relation-back is incorporated into W.R.C.P. 3(b), where commencement of an action relates back to the date the complaint was filed, so long as service upon the defendant occurs within sixty days thereafter.

[¶ 18] In the instant case, the district court concluded that the doctrine of relation "as set forth in *Walliker,*" controlled the outcome. Therefore, we will address that case in specific detail, the basic facts being gleaned from 608 P.2d at 1273: On some unidentified date, one Geneva Walliker entered upon certain property in Park County, Wyoming, under the Carey Act. She contracted for shares in a canal association to provide water to the land, she paid the State one-half of a required land fee, and she was in possession of a certificate of location and a receipt from the Wyoming land commissioner. Shortly thereafter, on July 14, 1928, she issued a conveyance to two grantees named Pearson and Robertson, which conveyance read, in pertinent part, as follows:

"... That the said party of the first part, for and in consideration of One and no/100 ($1.00) ... has Remised, · Released and Quit Claimed ... an undivided one-third interest in and to all oil and/or gas ...."

Walliker was not issued a patent to the land until some three years after this conveyance.

[¶ 19] *Walliker* was a quiet title action brought by the successors in interest to Pearson and Robertson, with the defendant being Walliker's heir. In affirming the district court, we held that Walliker's equitable title was sufficient to apply the doctrine of relation. *Walliker,* 608 P.2d at 1277. In other words, when Walliker acquired legal title to the lands in 1931, that title related back so as to give effect to her 1928 conveyance. To that extent, *Walliker* is a classic relation-back case, founded in the traditional land entry to patent rationale. Obviously, its logic, if limited to that circumstance, cannot be imported into the present controversy, where the issues have nothing to do with "proving up" ownership to government land.

[¶ 20]   There is another aspect of *Walliker*, however, that does more nearly equate the present facts.   The 1928 conveyance "Remised, Released and Quit Claimed . . . an undivided one-third interest in and to all oil and/or gas. . . ." *Walliker*, 608 P.2d at 1273. That wording raised two questions for this Court: (1) what was the effect of the "quitclaim" language; and (2) what was the effect of quitclaiming only a fractional mineral interest?   We will explain our resolution of those questions in *Walliker*, after which we will discuss how that resolution affects this case.

[¶ 21]   The defendant in *Walliker* contended that, inasmuch as the 1928 conveyance was by quitclaim deed, Wyo. Stat. Ann. § 34-2-105 (1977) barred application of the relation-back doctrine.   That statute, now Wyo. Stat. Ann. § 34-2-105 (LexisNexis 2005), and presently worded the same, provides as follows:

> Every deed in substance in the form prescribed in the foregoing section [§ 34-2-104], when otherwise duly executed, shall be deemed and held a sufficient conveyance, release and quitclaim to the grantee, his heirs and assigns, in fee of all the then existing legal or equitable rights of the grantor in the premises therein described, **but shall not extend to after acquired title unless words are added expressing such intention.**

(Emphasis added.)   In turn, Wyo. Stat. Ann. § 34-2-104 (LexisNexis 2005), also unchanged since *Walliker*, provides in pertinent part as follows:

> A.B., Grantor (here insert grantor's name or names, and place of residence) for the consideration of (here insert consideration) conveys and quitclaims to (here insert grantee's name or names) **all interest** in the following described real estate, (here insert description) situate in the county of . . . . . . . . . . . . . . ., in the State of Wyoming.
> Dated   this   . . . . . . . . . . . . . .   day   of . . . . . . . . . . . . . . . A.D. . . . . . . . . . . . . . . .
> . . . . . . . . . . . . . . . . . . . . . . . . A.B.

(Emphasis added.)

[¶ 22]   We applied the relation-back doctrine in *Walliker* despite this statute.   We held that a document conveying only a partial mineral interest, rather than **all interest,** is not a "deed in substance in the form prescribed" by statute, and is not, therefore, a quitclaim deed within the meaning of the statute.   *Walliker*, 608 P.2d at 1274–76.   The *ratio decidendi* of that holding was as follows:

> There is an obvious and substantial difference between a deed which conveys the grantor's entire interest and one which conveys only a portion of the grantor's interest.   Consistent with the after-acquired-title philosophy of §§ 34-2-104 and 34-2-105, supra, when a grantor who does not possess legal title quitclaims his **entire** interest in a piece of real property, the grantee cannot then expect that such a grant carries with it the implication that grantor has retained an equitable interest capable of ripening into legal title from which the grantee will then be permitted to claim.   But when a desert-land entry-woman quitclaims a **portion** of the mineral estate, while retaining an equitable interest in the surface estate, it is then logical for the grantee to expect that the grantor will later perfect legal title and thus perfect the grantee's mineral interest.   We said as much in a 1918 opinion which involved a similar issue.   *Roberts v. Hudson* [.]

*Walliker*, 608 P.2d at 1274–75 (emphasis in original).

[¶ 23]   The conveyances at issue in the present case are the 1998 Baseline leases. Each of the four leases is a multi-page oil and gas lease containing numerous terms and conditions detailing the lease term and the parties' obligations.   Despite the Harriet–Marton faction having edited out the form warranty language, these leases in no way resemble the quitclaim deed form prescribed in Wyo. Stat. Ann. § 34-2-104.   Therefore, just as in *Walliker*, Wyo. Stat. Ann. § 34-2-105 does not bar application of the relation doctrine.   The question remains, however, whether the doctrine is otherwise applicable.

■   [¶ 24]   The common element in all of the applications of the relation doctrine is the establishment of a right or interest through multiple steps:   entry and patent, permit ap-

plication and physical appropriation, materials supplied and completion of construction project, and filing a complaint followed by service of process. The central precept of the relation-back doctrine, in the property context, is that legal title obtained via patent relates back to equitable title obtained via entry, thereby giving effect to conveyances such as mineral leases occurring in the interim. That element is not present in the instant case. Here, there are no issues of entry or patent; the question, rather, is the effect of a series of leases emanating from the same grantor. We cannot help but conclude that the relation-back doctrine in the sense that it was used in *Walliker* is not applicable to the facts of this case.

### *Estoppel by Deed/After-acquired Title*

[¶ 25] We will briefly reiterate those facts that are particularly pertinent to this discussion: In 1975, Harriet–Marton owned the oil, gas, and other minerals, except coal, underlying the subject property. On December 11 of that year, Harriet–Marton entered into the above-mentioned agreement leasing to Gibbs the oil and gas for three years and as long as production continued in paying quantities. There is no dispute that Gibbs drilled productive wells.

[¶ 26] On May 21, 1998, Harriet–Marton executed oil and gas leases in favor of Lance–Williams covering the same property. These leases were for five year terms as extended by production, and provided that the lessor "grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring by geophysical and other methods, prospecting, drilling and mining for and producing oil and gas...." Harriet–Marton deleted from the lease forms the following language: "Lessor hereby warrants and agrees to defend the title to said land." It is undisputed that Lance–Williams paid Harriet–Marton initial bonus payments of $40.00 per

acre for 320 acres, and extension payments of $25.00 per acre.

[¶ 27] As described in detail above, Harriet–Marton then sued the Gibbs distributees in 2003 for the avowed purpose of having the 1975 agreement judicially declared to be terminated. That effort was, however, abandoned in mid-stream by a stipulated dismissal, as a result of which the Gibbs distributees assigned their interests in the Gibbs agreement to Harriet–Marton and the latter's newly formed limited liability corporation, Catherine No. 1, LLC.[4] On December 8, 2003, Harriet–Marton and Catherine No. 1, LLC, in turn, assigned to Kennedy their right, title, and interest in and to the Gibbs agreement. Significantly, even though the consideration under the Kennedy agreement was styled "consideration for assignment," royalties and other payments to Harriet–Marton were made as payments to the "owners," and were proportioned to their fee ownership. In substance, if not in name, the Kennedy "assignment" was in reality simply a new lease.

[¶ 28] The district court concluded that, under these facts, any interest in the mineral estate obtained by Harriet–Marton and Catherine No. 1, LLC, as a result of the 2003 assignment from the Gibbs distributees related back in time so as to give effect to the 1998 leases from Harriet–Marton to Lance–Williams. It is our conclusion that, while the relation-back doctrine as enunciated in *Roberts* does not apply under these circumstances, a similar result is dictated by necessary application of the doctrines of estoppel by deed and after-acquired title.[5] Estoppel by deed has been described as follows:

Estoppel by deed has been well defined as the estoppel or bar which precludes a party from denying the truth of his deed, but one which may be invoked only in a suit on the deed or concerning a right

---

4. Kennedy does not defend the after-acquired title argument by asserting that Gibbs' rights went to Catherine No. 1, LLC, rather than to Harriet–Marton in settlement of the probate dispute.

5. We are not called upon in this case to state whether there is any distinction between the doctrines of estoppel by deed and after-acquired title

and we have used them interchangeably. *See Wood v. Sympson,* 1992 OK 90, 833 P.2d 1239, .1243 (Okla.1992) ("the doctrine of after-acquired title or estoppel by deed"); and *Hays v. King,* 109 N.M. 202, 784 P.2d 21, 23 (1989) ("doctrine of after-acquired title is sub-category of general doctrine of estoppel by deed").

growing out of it. It precludes a party to the deed and also those in privity with him from asserting as against the other party thereto and his privies any right or title in derogation of the deed or from denying the truth of any material fact asserted in it. Though an estoppel may be created by the record of other conveyancing instruments than a deed, the most common are those estopping a grantor to assert a title which he acquires subsequent to a conveyance by him.

\* \* \*

It is the general rule that one who acquires a title or estate which he has previously conveyed is estopped to assert his after-acquired title as against the grantee or his successors.

3 *American Law of Property* §§ 15.18, 15.19 (A. James Casner ed., 1952) (footnotes omitted).

Estoppel by deed binds not only the grantor but also those in privity with him. The well-established general principle is that a grantor and his privies are estopped as against the grantee and those in privity with him to assert anything in derogation of the grant or from denying the truth of any material facts stated in the conveyance. A grantor is generally estopped from denying the title of his grantee or his own authority to sell. One who assumes to convey an estate by deed will not be heard, for the purpose of defeating the title of the grantee, to say that at the time of the conveyance he had no title, or that none passed by the deed, and he cannot deny the full operation and effect of the deed as a conveyance. In other words, he is estopped to dispute the title granted.

28 Am.Jur.2d *Estoppel and Waiver* § 11 (2d ed.2000) (footnotes omitted). The doctrine applies not just to deeds, but also to leases. *Id.* at § 4.

■■■ [¶ 29] Estoppel by deed generally is based upon the covenants contained in a warranty deed, and does not, therefore, arise from a conveyance via quitclaim. 3 *American Law of Property, supra,* § 15.19; 28 Am.Jur.2d, *supra,* § 6; 4 Herbert Thorndike Tiffany, *The Law of Real Property* § 1231 (3d ed.1975); 26A C.J.S. *Deeds* § 261 (2001).

This rule is not absolute, however, and despite being a quitclaim in form, a conveyance may give rise to estoppel by deed when it "contains language showing that the grantor intended to convey and the grantee expected to acquire a particular estate." 28 Am. Jur.2d, *supra,* § 6; 4 *The Law of Real Property, supra,* §§ 1230–31. Alternatively stated, a "quitclaim deed is one which purports to convey, and is understood to convey, nothing more than the interest or estate in the property described of which the grantor is seized or possessed, if any, at the time, rather than the property itself." 26A C.J.S., *supra,* § 17 (footnote omitted). In that sense, a document that purports to convey a particular interest simply is not a quitclaim deed. The nature of a particular conveyance is determined by the intent of the parties:

> Whether or not an instrument constitutes a quitclaim deed depends on the intent of the parties to it as gathered from the language of the instrument itself, and the attending circumstances, such as the adequacy of the price given, and is not to be determined by the mere omission or presence of a covenant of warranty, although ordinary quitclaim deeds omit warranties of title.

*Id.* (footnotes omitted). *See also Sabine Production Co. v. Guaranty Bank & Trust Co.,* 432 So.2d 1047, 1052 (La.Ct.App.1983).

■■■ [¶ 30] A grantor may also be statutorily estopped from asserting after-acquired title, despite the lack of warranties in a quitclaim deed. 3 *American Law of Property, supra,* § 15.19. In addressing the *Walliker* decision, we have already discussed Wyo. Stat. Ann. §§ 34–2–104 and 34–2–105, wherein the bar to conveyance of after-acquired title via quitclaim deed is specifically limited to those quitclaim deeds that appear in the statutory form. Furthermore, we have already concluded that the 1998 Baseline leases at issue in the present case do not resemble the statutory quitclaim deed, and therefore the statutes do not apply in this case to bar application of the related doctrines of estoppel by deed and after-acquired title.

[¶ 31] The general principles of law discussed above were long ago established as the law of this state. *See Town of Glenrock v. Abadie,* 71 Wyo. 414, 259 P.2d 766, 769 (1953); *Sharples Corp. v. Sinclair Wyoming Oil Co.,* 62 Wyo. 370, 168 P.2d 565, 566–569 (1946); *Roberts,* 173 P. at 788; and *Balch v. Arnold,* 9 Wyo. 17, 59 P. 434, 435–36 (1899). The 1998 Baseline leases conveyed certain and particular mineral interests; despite the grantors' excision of the warranty language, they were not intended to be quitclaim deeds. Therefore, Harriet–Marton and Catherine No. 1, LLC, are estopped from denying the title Lance–Williams obtained therefrom, and they are estopped from raising their after-acquired title in derogation of Lance–Williams' interests. The district court's equitable resolution of this dispute is more properly founded in the doctrine of estoppel by deed than in the doctrine of relation. Furthermore, that equitable resolution offends no rule of law and is particularly suited to a quiet title action where the competing claimants derive title from a common source; in such case, the party with "the superior title or equity must prevail." *Torgeson v. Connelly,* 348 P.2d 63, 73 (Wyo.1959).

### The Recording Act

[¶ 32] Wyo. Stat. Ann. § 34–1–120 (LexisNexis 2005) provides as follows:

Every conveyance of real estate within this state, hereafter made, which shall not be recorded as required by law, shall be void, as against any subsequent purchaser or purchasers in good faith and for a valuable consideration of the same real estate or any portion thereof, whose conveyance shall be first duly recorded.

[¶ 33] In its primary and reply briefs, Kennedy cites the statute, notes its "race notice" effect, and notes the numerous documents of record that gave constructive notice to Lance–Williams of the existence of the Gibbs agreement. Kennedy's argument is summed up in the following sentence from its primary appellate brief: "By operation of this statute, the 1975 lease takes precedence of the 1998 leases acquired by Lance and Williams absent bases for application of the doctrine of after-acquired title or relation back and regardless of notions of justice and equity." Lance–Williams provide a two-pronged response: first, that the Gibbs agreement, itself, never was recorded, and second, that the other documents of record were insufficient as a matter of law to provide constructive notice of the Gibbs agreement. In applying its equitable resolution of the matter, the district court apparently did not consider this statute and the concept of record or constructive notice. It did, however, premise that equitable resolution upon Kennedy's actual notice of the Lance–Williams leases, in contrast to Lance–Williams' lack of actual notice of the Gibbs agreement.

[¶ 34] We will not further consider this issue because to do so would violate the fundamental principle of the doctrine of estoppel by deed. In 1998, Harriet–Marton leased the subject property to Lance–Williams and is estopped from challenging the efficacy of those conveyances. That estoppel applies also to Kennedy, as Harriet–Marton's successor in interest. *Body v. McDonald,* 79 Wyo. 371, 334 P.2d 513, 515 (1959). If Harriet–Marton and Kennedy cannot assert their after-acquired title, there are no conflicting documents upon which the recording act can operate. Kennedy conceded as much in its appellate brief by acknowledging that the recording act would give precedence to the Gibbs agreement "absent bases for application of the doctrine of after-acquired title[.]" [6]

## CONCLUSION

[¶ 35] In 1998, Harriet–Marton leased the subject property to Lance–Williams. In 2003, Harriet–Marton leased the subject property to Kennedy. Harriet–Marton and

---

6. Beyond all that is the fundamental question, not addressed by the parties, of whether Kennedy, who had both actual and record notice of Lance–Williams' interests, was a good-faith purchaser to whom the protections of Wyo. Stat. Ann. § 34–1–120 are available. *See Grose v. Sauvageau,* 942 P.2d 398, 402–03 (Wyo.1997); *Soppe v. Breed,* 504 P.2d 1077, 1080 (Wyo.1973); *North Am. Uranium, Inc. v. Johnston,* 77 Wyo. 332, 316 P.2d 325, 328–29 (1957); and *York v. James,* 60 Wyo. 222, 148 P.2d 596, 598 (1944).

Kennedy are estopped from contesting the title that passed to Lance–Williams and from asserting their after-acquired title.

[¶ 36]   Affirmed.